United States District Court
Southern District of Texas
FILED

MAR 17 2017

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

UNITED STATES OF AMERICA

v.

RUBEN JAMES RIOS

Criminal Case No. 7:15-CR-775

Civil Case No.: _____

M-17-92

## SWORN DECLARATION OF RUBEN JAMES RIOS

    My name is Ruben James Rios. I declare that I am over the age of 18 years and have personal knowledge of the facts in this case. I swear that the foregoing is true to the best of my knowledge under threat of penalty of perjury.

1. I bought my laptop computer used approximately one year before my arrest.

2. I installed Shareaza, the file sharing software, in May 2014. I updated it several times since that installation.

3. Shareaza allows users to create a "library" of folders in order to store, process, and share downloads. The Shareaza Installation Wizard displays a window that indicates the three file folders it can create by default. I selected all of these folders and used the "delete" option so as to avoid creating them. I therefore did not create a "shared" folder and did not have a "shared" folder.

4. The Shareaza software needed a folder designated to deposit downloads into, so I utilized the "Downloads" folder that already existed because it came with the Windows Operating System on my computer. This "Downloads" folder was not set for file sharing through Shareaza, nor did I ever set to be browsable. I would not have made this folder available for sharing or browsing because it contained files with my personal information in them - specifically my resume and tax form.

5. I informed the investigator, Ullrich, that I did not have any folders set to "share" through Shareaza on the Shareaza network. Ullrich responded by saying that he could download anything I had, even files that were incomplete. He told me that he could download directly from my download stream, which if true, would mean this invasion of privacy constituted a search without a warrant. Ullrich's misinformation led me to believe that he could in fact download from me even though I had taken steps to make sure nobody downloaded from me, although I discovered through case law that he could not. I was not disabused of his misinformation when I entered my plea, and any agreement I made at the plea hearing with respect to Ullrich's downloading or receiving data from me was erroneous and involuntary and directly because of his lies to me during my interrogation.

6. Shareaza provides a display or window that enables the user to see who else is also receiving the queried file. While Ullrich was downloading the file from a user who was sharing, he observed my IP as also receiving the file. Observing my IP in the "Receiving" window of Shareaza would be consistent with his statement that he was investigating people who were "receiving" child pornography.

7. Paragraph 3 of my presentence report states that I was "sharing" using Shareaza. I deny that because it is untrue. I never created a "shared" folder, I used a pre-existing "Downloads" folder that I never set to share or browse. I deleted the files from the "Downloads" folder as soon as they were downloaded. After the Shareaza session I would then move the downloaded and deleted files from the computer to the thumb drive to insure they could not be accessed by anyone else. I usually did not even view them before moving them to the thumb drive.

8. My statements to Ullrich and his explanation to me were recorded verbatim by Ullrich when he tape-recorded my interrogation. There exists a verbatim record of me informing Ullrich that I did not "share" because I never set up a folder for sharing and his explanation to me that I did not have to in order for him to be able to download from me. Benevidas withheld that verbatim record from me which facilitated the erroneous application of the distribution enhancement.

9. Ullrich intentionally misled the court. During sentencing, Ullrich informed the district court that I told him that I used The Onion Router, also known as TOR, to conceal what I was doing online. Ullrich also told the court that TOR would bounce my IP address around through a network of anonymous routers. The latter information makes the former patently false information because the protocols that Shareaza uses requires transparency of IPs and access to other people's computers in order to locate and download the files. TOR is specifically designed to do away with that transparency and access by masking IP's, as Ullrich explained to the court. Ullrich had reason to know he was providing the court with false information, because the scenario he told the court not only did not occur but is also technically impossible, and he deceptively attributed this false and misleading information to me as the source to poison the court during my sentencing. This is crucial because it shows Ullrich's propensity for perjury under oath.

10. What I had actually explained to Ullrich and Reneau was that I installed the software for The Onion Router (TOR) after I learned that I could access "Miriam's Web" through TOR. Ullrich asked me if I knew that TOR could mask my identity and make me anonymous on the internet, and I said that I was aware of that. Whether I knew of TOR's ability to mask my IP, I did not tell him that I used it for that purpose - Ullrich is the one who told me.

    Ullrich just could not speak the truth from his mouth during my sentencing hearing.

11. I learned of "Miriam's Web" through 'listverse.com', which is a site that provides information about sites that contain scientific or pseudoscientific information, or information about paranormal things such as hauntings. "Miriam's Web" is purportedly a site accessible through TOR uses "sentient artificial intelligence". I was curious about what "sentient artificial intelligence" would do or look like, so I downloaded TOR. I did not locate Miriam's Web.

12. Similarly, I explained to Ullrich that I had downloaded a video, which I learned upon watching was of a young girl being severely physically abused. I told him that I was upset by the video and that it made me sick. I also said that I suspected that the girl had also been sexually abused, although the video did not depict sexual abuse. I did not observe the girl being sexually abused. During this part of the interrogation, Ullrich asked me why I downloaded the video then. I explained that I did not know what it was and had no way to know it would be so upsetting. Ullrich then suggested that I "liked the awe of it" and Ullrich's suggestion was deceptively passed off as my statement.

    Ullrich simply would not be truthful.

    Even more disturbing is that Benavides "listened carefully" to the recording of my interrogation so Benavides knew that I did not say that I used the TOR browser to mask my identity or that I "liked the awe" of the girl's abuse. Benavides suborned Ullrich's perjury time and time again during my sentencing, and in my direct appeal, the government stressed that the court relied on this particular perjury and deception (concerning the "awe" of the abused girl and using TOR to mask what I was doing online) to justify my severe sentence.

    These issues are important because it shows that both Ullrich and Benavides are basically dishonest and have severely deviated from their ethical obligations to be truthful, which deprived me of DUE PROCESS OF LAW and fundamental fairness during my sentencing. Instead Benavides withheld the

reliable information that contradicts Ullrich from my counsel Jarvis in order to facilitate Ullrich's deception. It is important for the court to keep in mind that Benavides and Ullrich perpetrated fraud during my prosecution through their unethical conduct, and my indolent and incompetent counsel permitted them to do so through his failure to research and investigate my case. Examining my computer for file-sharing ability and seeking and listening to the audio record of my interrogation - thereby informing himself of the facts independently from Ullrich's deceptive version - would have equipped my indolent and incompetent counsel to dispel Benavides subornation of perjury.

13. I took affirmative steps to prevent file sharing; I did not create any of the shared folder that can be created by Shareaza; I immediately deleted downloaded files from my "Downloads" folder to the recycle bin, where they were not available for sharing; and then I removed the completed files from my computer to a thumb drive to get them off my computer.

14. It is obvious that Ullrich performed a query using a search term commonly associated with child pornography, and began a download of a file that turned up. Ullrich then went to Shareaza's "Receiving" window and noted the other IP addresses downloading the same file, and got a search warrant for my IP and possibly others. But he never received a portion of the file from me as he said he did because I did not create a folder for sharing, and I never designated my "Downloads" folder for sharing, so I did not share and he could not receive anything from me. Ullrich also never browsed or searched my "Shared Folder" and located other files with "titles consistent with child pornography" as he said he did because I never set my "Downloads" folder to be browsed, which is why Ullrich must use such vague and conclusory terms in his search warrant and elsewhere instead of providing the court with particularized information, such as the titles or the quantity he saw.
It is apparent that Ullrich operated on the assumption that I was sharing, he believed he could get away with making false statements (and he did - because of Jarvis's indolence and incompetence), and never expected to have this falsehood challenged.

15. When I informed Ullrich that he was wrong because I did not set up my computer to support sharing, Ullrich told me that he intercepted what I was downloading. If this were the case, then Ullrich was not using his software to download what I offered to the public, he was intercepting my download without a search warrant, which taints his probable cause evidence and resulted in him seeking a search warrant that was improperly motivated by what he saw during a prior illegal search.

In the Criminal Complaint Affidavit, Reneau stated that Ullrich downloaded numerous movies from me, yet did not name any or even put a quantity on them, or descibe the contents except in the most general terms. In the PSR, Ullrich says he downloaded a part of one movie from me, which substantially contradicts Reneau. In the PSR, Ullrich states that he saw that my computer was set to distribute for a thing of value, but not for pecuniary gain. During sentencing, Benavides completely backpedaled on the false allegations made by Ullrich by saying there was no evidence of distribution in trade for a thing of value. From these contradictions and adding the explanation Ullrich gave me during my interrogation, there are five different government versions of what happened. One thing is clear, however; Ullrich is lying about downloading from me in the manner he said he did.

16. On May 27, 2014, a search warrant was executed at my home at 7AM. Several federal agents and local police used a ram to break my family's door from the frame. Investigators rounded up my family and brought them outside for questioning.

17. I was sleeping in a separate room from the main residence in a garage space that had been converted into a bedroom. When investigators learned from my mother and brothers that I was still in the house, the investigators also broke my door, and with guns drawn they entered my bedroom and arrested me. I was in my shorts. They threw me on the floor and handcuffed me, then lifted me to my feet and walked me outside. They un-cuffed me outside and brought me back inside for interrogation twenty minutes later.

18. Ullrich and Reneau sat me at the kitchen table with two other officers in the room, and began questioning me. More investigators or officers stood in the adjacent rooms witnessing the interrogation. These officers appeared to be blocking my exits. During this time more investigators seized my computer, a portable hard drive, and an 8 GB thumb drive from my bedroom, but they overlooked the white Lexar 16 GB thumb drive, which was sitting with some collectable figurines in my bedroom.

19. While seated at the table, I was questioned in the presence of four law enforcement officials including Ullrich and Reneau. Ullrich did not read me my rights. I was in my shorts, and the room was dominated by the police. I had just been thrown on the ground and handcuffed while I had numerous firearms pointed at me. Ullrich was the primary interrogator.

20. Ullrich did most of the questioning. He asked me if I knew why they were there. I responded that they must be looking for drugs. I asked if they had a warrant and was told they had one. I asked to see it and was told that was not important. Ullrich then asked me if I had a computer. I answered that I did. He asked me what I used it for. I explained that I used it to watch movies, listen to music, and playing games. Ulrich asked if I used my computer to watch pornography. I said yes. He asked what kind. I told Ullrich I did not feel comfortable answering that question and Reneau spoke up and said "Come on, we're all guys here", and "we all have different things we like". Reneau kept up the harassment and I finally began telling them that I liked Asians, Hispanics, and black women.

21. Ullrich asked me what else I liked to watch. I told him I did not know what he meant. Ullrich asked me if I watched something unusual or risky. I said I did not know. He asked if I liked young girls. I said that I supposed so. He asked me "How young?" I answered that I liked young women in their twenties. Ullrich asked me if I liked them younger than that. To me that seemed to include 18- or 19-year olds in the context of my previous answer, so I answered yes. Then Ullrich asked if I liked girls younger than that, so I asked if they were talking about child pornography. Ullrich responded by saying that I knew why they were there.

22. I asked again to see the search warrant and Ullrich showed me it was to seize computer and electronic media for a child pornography investigation. They asked if I had any storage media that had any child pornography on it and I had better tell them. I said that my computer might have something on it. They asked how much and I said that I did not know. I was told to take a guess, so I responded that I might have fifty files. Ullrich said he was going to need more information.

23. Ullrich asked me how I located these files, so I explained that I used a search term of 'ptch' Ullrich corrected me and told me that it was 'pthc'.

24. Ullrich and Reneau questioned me about my search patterns and what was on my computer for about an hour. He repeatedly told me I had better answer his questions, and not hold back any information or it would be bad for me. Ullrich and Reneau threatend me repeatedly like this during my interrogations.

25. At this point I asked if I could put on some pants and get dressed. Reneau escorted me to my bedroom while other officers watched. I was getting dressed when I spotted the white Lexar thumb drive sitting with some figurines on a shelf. I was shocked and puzzled that the investigators had not seen it during their search. Reneau demanded to know what I was looking at. He had not spotted the thumb drive. I remembered their threat that I had better tell them, so I said I was looking at the white object. Reneau did not recognize it and asked me what it was. I explained that it was a jump drive, also known as a thumb drive. In this way, I was compelled to be a witness against myself. Reneau took the drive, and then escorted me back to the kitchen and sat me at the table.

26. When the investigators ordered me to sit down at the table the second time, I asked if I could have a lawyer. Ullrich said "Yeah, yeah, but first we need you to sign this and answer some more questions." The investigators did not scrupulously honor my request for an attorney. Instead, they told me I must answer more questions. Ullrich told me it would be easier on me if I answered their questions before I got a lawyer, and again told me I had better not keep anything back from him. Ullrich then had me sign the Miranda papers which included a waiver of my attorney privilege. In this way I was forced to waive my attorney privilege after I unambiguously requested an attorney. This illegal act has been concealed from the district court by both Benavides and Ullrich, and it is clear that Benavides suborned a type of perjury because he is the one who stressed that my statements were all "post-Miranda" statements when he examined Ullrich during my sentencing.

27. After Ullrich "Mirandized" me, he reviewed the same questions he asked before the attorney waiver and I provided him the same answers or explanations. We did not cover anything new that I recall. One thing that can be heard throughout the "post-Miranda" interrogation is Ullrich making numerous references to my earlier pre-Miranda interrogation and wanting to review my answers to those questions. Benavides informed the court that he listened to my interrogation carefully, yet he withheld from the court that the interrogation was merely rehashing the earlier illegal interrogation. Benavides breached his ethical duties by concealing the illegal interrogation and illegal attorney waiver that tainted the post-Miranda interrogation.

28. Benavides knowingly concealed from the court and my counsel that my interrogation was performed in violation of my constitutional rights, and that the government did not obtain any information from me that was not tainted by illegal conduct. Benavides committed a breach of ethics which denied me DUE PROCESS OF LAW and allowed illegally obtained information into my sentencing hearing. Benavides withheld from my counsel the verbatim audio recording of my "post-Miranda" statements as well as the fact of the prior interrogation and the fact of my ignored attorney request so that my illegally obtained statements would go unsuppressed so they may be used against me during sentencing. I maintain that even if those statements were true (I maintain that many were fabrications by Ullrich), they were obtained in an illegal manner and should not have been introduced in my sentencing hearing or presentence report. There is no physical evidence in my case to support either of the two enhancements, and the false information provided by Ullrich is the only evidence there is to consider. I maintain that Ullrich repeatedly lied and deceived the court during my sentencing hearing, which Benavides knew about because he said he "listened carefully" to the audio of my interrogation, and Benavides withheld the audio record of my interrogation from my counsel to facilitate the numerous lies and misrepresentations that spewed from Ullrich.

29. When Ullrich performed the search which resulted in providing my IP address to him, my "Downloads" folder contained my resume - which was titled "Ruben Rios Resume" - and my TurboTax income tax form - which contained my name and social security number.

30. When investigators broke the door to my house, they immediately seized both of my brothers and began questioning them. They also asked if there was anyone else in the house and my mother told them I was sleeping in the garage apartment, so they then broke my door and arrested me as well. The investigators seized both of my brothers' computers. It is apparent that investigators did not know exactly who they were looking for, although my personal information - including my name and social security number -  was located on files in the folder which Ullrich claimed to have been "shared" and "browsed" by him. Ullrich could have easily obtained my name just from the title of my resume if he had examined my "shared" folder as he stated he did, rather than his conduct and the conduct of other investigators in arresting and questioning my brothers because they did not know who they were looking for, and seizing my brothers' computers for examination as well as my own.

31. In addition, the government returned my brother's (Adam Navarro) computer in a disassembled and damaged state. Disassembly is consistent with accessing the hard drive in order to install a 'write-blocker' for the purpose of doing a forensic examination of a hard drive, so it is clear that

Ullrich did not recognize the files in my purportedly "shared" folder because if he did recognize them then he would have had no reason to damage my brother's computer for forensic examination because the need to search Navarro's computer would have been obviated by a cursory examination of my "Downloads" folder, which still contained my resume and tax form. The search of my brother's computer therefore extended beyond the scope of the warrant, which referred to the IP of the residence and made reference to the file Ullrich downloaded during his initial search for people who were receiving child pornography, and his claim that he browsed my shared folder and saw my files. It is clear that Ullrich is lying about this; had Ullrich actually browsed my computer and seen other files in my shared folder, as he said he did, he obviously would have included more particularized information in the search warrant than the generalities he used, and the search of my brother's computer would have been obviated because excluded from the scope of the warrant.

32. Another fact that makes Ullrich's statements unreliable (because of his propensity for falsehoods) is that Ullrich asserted that he saw several other files with titles that were indicative of child pornography, but failed to name any of those additional files that he claimed to have seen, and failed to provide the quantity of files he purportedly saw on this particular search. His use of vague or general information and terms is suspicious because had he seen other files as he said he did, and as the presentence report indicates, there would be some particularized information to support his allegations. Ullrich's allegations are vague and lack particularity. It is clear that he works from a preconceived template that he uses in most of his cases rather than truthfully stating particular facts that he did observe, because the facts he stated were so unparticular and general that they would fit almost every peer-to-peer investigation - except mine. And it was clear that he was lying but insulating himself from a perjury charge by stating "as I recall ..." before making certain false statements when he did not need to "recall" anything because he created a verbatim record of my statements when he recorded my interrogation and had that to reference and did not need to rely on memory. In fact, my true statements could have been played for the court, rather than resorting to Ullrich's fraudulent and deceptive "recollection" of my statements.

33. The government seized my computer, a 160 GB portable hard drive, and two thumb drives - an 8 GB and a 16 GB. The 160 GB portable hard drive was damaged; I had opened the case and touched and damaged the magnetic platter and after I reassembled it, the hard drive did not work. The government never recovered any contraband from that particular drive that I am aware of. As for the 8 GB thumb drive, the files on it had been moved to the 16 GB thumb drive and deleted from the 8 GB thumb drive. The government alleges they obtained 109 movies from the 16 GB drive, and my attorney informed me that one file was recovered from the recycle bin. There are 147 videos in total, so 37 movies were forensically recovered from the 8 GB drive - but those are duplicates of the ones on the 16 GB thumb drive and they did not coexist in a way to justify counting them twice because removed from the smaller drive to the larger.

34. Shareaza sometimes provided a preview of a movie or video, but not always. With some downloads, there was no preview available, and an icon in the shape of a traffic cone was present instead of the preview thumbnail image. When the preview was available, it was only a small thumbnail image, which on my computer was about the size of a pencil eraser. Since the thumbnail images were very tiny, and often only a black picture, the previews did not serve well to determine any movie content. Contrary to Ullrich's description in the courtroom, I did not possess the ability to "hover" the mouse over the thumbnail image and get a separate preview or enlarge the thumbnail image; the eraser-sized thumbnail image was the preview and the preview Ullrich described did not even exist on my version of Shareaza. I deleted many videos after I was able to view them because they were not something I intended to receive. Ullrich made misleading statements concerning my ability to preview the videos and created a (fallacious) basis for the application of the Vulnerable Victim enhancement.

35. As I stated during my interrogation, I sought videos that depicted 10-14 year olds. I did not ever target toddlers or infants. I never knew, nor did I have reason to know, that I was receiving images of infants or toddlers. I never saw a preview that I know of that contained an infant or toddler. Those types of files disgust me and do not fit the type that I sought. I also never viewed a video which depicted an infant or toddler, so I never even knew that I possessed any such videos.

36. I must also make clear to the court that very often I removed files from my computer before viewing them, so I did not view all the videos on my thumb drive or computer. I took them off the computer immediately to insure they were not uploaded by anyone else. I explained to Ullrich that I had numerous videos that I had never viewed.

37. When I was questioned by Reneau and ullrich, Ullrich asked me if I knew how a peer-to-peer program worked, and I said that I did. Ullrich told me that he had downloaded from me. I told them that downloading from me was not possible because I had no "Shared Folder". Reneau and Ullrich looked at each other, then Ullrich said that someone could download from me even if I only had a small percentage of the file. Ullrich said they could get bits and pieces of data directly from the "incomplete stream" that I was receiving.

38. The disappointment is that my family paid Jarvis $8,000 to represent me. He originally asked for $12,000, but all we had was $8,000. I submit to this Court evidence of $4,0000 payment by check. We believed this would include an examination of my computer. But we got almost nothing for this money except a 'position paper' that only served to prejudicially inflame the court. Jarvis never even showed me any of the discovery materials. Ever. Jarvis could have at least shown me the discovery materials and discussed them with me so there would have been some structure to his brief attorney visits and he could have prompted me to tell him about different aspects of my case, such as illegal interrogation or the false allegation of file sharing. I had to learn about these things here through the Law Library. Jarvis ripped us off.

39. When I heard the government's argument during sentencing about the applicability of the distribution enhancement, I turned to Jarvis and insisted that Ullrich was lying, and told him whenever Ullrich lied on several occasions. Jarvis's response to me was "Don't say anything, I know what I'm doing." Apparently, he DID NOT know what he was doing. He obviously never listened to the recording of my interrogation, in which my real statements contradicted those purported statements Ullrich falsely claimed that I made and which were so prejudicial to me, and that I told Ullrich I never shared and Ullrich told me that he intercepted my download stream, because Jarvis never made a peep of an objection to Ullrich's lies. Jarvis had assured my family that he would oppose any distribution enhancement. I submit my Mother's Sworn Declaration to corroborate that allegation.

40. I told my appellate counsel that Ullrich could not download from me and that I had no idea that I had the two movies containing the vulnerable victims. Appellate counsel told me there was nothing he could do about those enhancements.

41. In addition, Ullrich misled the probation officer in the PSR, saying that he found evidence of distribution for a thing of value by examining my computer, which Benavides capitulated on during sentencing. By making a false assertion that required correction, it is clear that Ullrich is simply making up his facts about my purported distibution, as evidenced by Benavides's need to capitulate on Ullrich's hogwash story and correct it. If Ullrich had not been lying, then there would have been no need for Benavides to cover for Ullrich.

42. There is no valid appeal waiver in my case because I did not execute a plea agreement. My attorney came to see me for an attorney visit. Jarvis tore off the last page of what I now believe was my plea agreement and held it up to the window for me to read. That one page was the very simplistic Acceptance of Responsiblily page. After showing the Acceptance of Responsibility page to me, Jarvis asked me if I had any questions. Of course, that one page was easy to understand, so of course I did not have any. Jarvis gave that one page to the jail guard to bring to my side of the visitor's station. I never saw the rest of the plea agreement, and did not see the waiver. Jarvis inveigled the signing of the plea agreement in this way, and I never entered into it knowingly and voluntarily because of his trick.

43. What Jarvis did tell me was that signing that one page, the government would be able to keep my computer and storage media.

44. Jarvis pulled a similar trick with my presentence report. He only showed me the sentencing level computation portion with any care. He rapidly showed me some of the rest of it, but he did that so quickly that I never got to review the entire PSR. So of course I did not know of Ullrich's false information about my purported distribution in the presentence report. I learned of that here at Bastrop FCI.

45. I swear that the foregoing is true and correct under penalty of perjury.

Respectfully submitted,

Ruben James Ritz
# 89118-379
PO BOX 1010
Bastrop, TX 78602

9